IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DEMARCUS BELL                                                                    PLAINTIFF

v.                                                       CIVIL ACTION NO. 3:21-CV-140-SA-JMV

FEUER POWERTRAIN NORTH AMERICA, INC.                               DEFENDANT

ORDER AND MEMORANDUM OPINION

DeMarcus Bell initiated this civil action on June 24, 2021, by filing his Complaint [1] against FEUER Powertrain North America, Inc. ("FEUER"). Now before the Court is FEUER's Motion for Summary Judgment [49], which has been fully briefed. Having reviewed the filings and applicable authorities, the Court is prepared to rule.

*Relevant Factual Background*

Bell began working at FEUER as a maintenance technician in April 2019. In September 2019, Bell's supervisor, Ken Hittlet, made a sexual comment towards Bell while working. In his deposition, Bell described the comment as follows:

> Q.    And what was the joke exactly?
>
> A.    I had to go upstairs and grab some molding.
>
> Q.    Uh-huh.
>
> A.    And the molding, it was black. It was about 6 feet long, and I had it maybe – I had it double tied around my neck close – hanging down. And he grabbed a piece of it and put it to my mouth and – and, you know, he was shaking it.
>
> Q.    Uh-huh.
>
> A.    And I said, That ain't – that ain't very nice, and he said, What you don't like black cock?

[49], Ex. 1 at p. 6.

Bell alleges this incident was "the only action that led to [his] sex discrimination claim." [49], Ex. 1 at p. 10.

Bell alleges that, subsequent to this incident, Hittlet's behavior towards him began to change. Hittlet began talking more to the other workers on the floor and giving Bell more work while "sticking [him] off to the back." [49], Ex. 1 at p. 11. Bell testified that he was "not sure" why Hittlet's attitude toward him began to change. *Id*. Later in September 2019, after noticing Hittlet's change in behavior, Bell reported the sexual comment in writing to Claire Kammerer, FEUER's Human Resources Director. Bell heard nothing more about his report until December 2019. At that time, Kammerer informed him that Hittlet admitted to making the comment and that she had reprimanded him and scheduled an anti-harassment training for December 2019.[1]

On December 5, 2019, Bell submitted a letter of resignation, to be effective December 19, 2019.[2] Kammerer then called Bell on his day off to ask if he was "really leaving," to which he responded "it's always open for discussion." [49], Ex. 1 at p. 17. On December 11, 2019, Bell met with Kammerer and discussed his pay, among other things that may have encouraged him to stay. Bell considered the decision overnight and formally informed Kammerer the next day that he wished to rescind his resignation. Before he informed Kammerer, Bell first informed Hittlet that he intended to rescind his resignation, and Bell did not perceive Hittlet's reaction as a positive one. When Bell informed Kammerer that he wished to stay at FEUER, Kammerer did react positively and tore up his letter of resignation in the presence of Sandra Sultan, Kammerer's assistant. When asked at his deposition if he knew whether Kammerer had the authority to accept his recission, Bell stated he was aware that CEO Marco Illig was Kammerer's superior, but he believed that

---

[1] Bell spends considerable time in his brief discussing the adequacy of Kammerer's investigation. The Court does not find this particularly relevant to the elements of retaliation discussed herein.
[2] Bell admits and FEUER emphasizes that Bell's resignation was voluntary and due to his having found a new job. *See* [49], Ex. 1 at p. 16.

2

Kammerer "[made] the call right there on the spot" to accept the rescission of his resignation. [49], Ex. 1. at p. 20.

Later the same day that Kammerer ripped up Bell's letter of resignation (December 12, 2019), through an office window, Bell witnessed Kammerer and Hittlet meeting in the HR office. Though Bell could not discern what was being said, he believed their hand gestures indicated they were engaged in a heated argument. After Bell witnessed this interaction, Kammerer informed him that a member of management opposed him rescinding his resignation.[3]

On or about December 13, 2019, at FEUER's Christmas party, Illig told Bell he wanted to discuss Bell staying on at FEUER. According to FEUER, Illig was the ultimate decisionmaker with respect to whether the company would allow Bell to rescind his resignation. When Bell later met with Illig, he was not allowed to rescind his resignation. Bell asserts that Hittlet talked Illig out of allowing him to stay at FEUER when Hittlet, Kammerer, and Illig held a meeting prior to Bell's final meeting with Illig. More specifically, Bell asserts that Hittlet persuaded Illig to reject his recission due to Bell's complaint regarding Hittlet's sexual comment.

Thereafter, Bell initiated this lawsuit. Although Bell initially asserted claims of sex-based discrimination and retaliation, he voluntarily withdrew the discrimination claim, leaving the retaliation claim as his sole claim. FEUER asserts that "Bell's September 2019 complaint had no bearing on the decision not to allow Bell to rescind his resignation." [49], Ex. 2 at p. 2. Thus, FEUER moved for summary judgment on Bell's claim for retaliation.

*Summary Judgment Standard*

Summary judgment is appropriate where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56.

---

[3] Bell recounted this event in the affidavit attached to his Response [56], which FEUER challenges under the sham-affidavit doctrine. The Court addresses this in its analysis below.

The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. 2548. If the movant makes such a showing, the burden shifts to the non-movant to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324, 106 S. Ct. 2548. The evidence must be viewed and reasonable inferences must be drawn in the light most favorable to the non-moving party. *Crochet v. Bristol-Meyers Squibb Co.*, 804 F. App'x 249, 251 (5th Cir. 2020) (citing *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002)).

*Analysis and Discussion*

Before analyzing the substance of Bell's claim, the Court feels compelled to address FEUER's argument regarding the sham-affidavit doctrine, as the Court's conclusion as to that argument will impact the facts it will consider.

I.    *Sham-Affidavit Doctrine*

Under the sham-affidavit doctrine, the Court will "not allow a party to defeat a motion for summary judgment by using an affidavit that impeaches, without explanation, sworn testimony." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)). This prevents a nonmoving party from "manufactur[ing] a dispute of fact merely to defeat a motion for summary judgment." *Free v. Wal-Mart La., LLC*, 815 F. App'x 765, 766 (5th Cir. 2020) (quoting *Doe ex rel. Doe v. Dallas Indep.*

4

*Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000)). "However, not every discrepancy in an affidavit justifies disregarding it when evaluating summary judgment evidence." *Seigler,* 30 F.4th at 477 (citing *Winzer v. Kaufman Cty.*, 916 F.3d 464, 472 (5th Cir. 2019)). Indeed, "the bar for applying the doctrine is a high one, typically requiring affidavit testimony that is 'inherently inconsistent' with prior testimony." *Id.* (quoting *Winzer*, 916 F.3d at 472) (additional citation omitted). "An affidavit that 'supplements rather than contradicts prior deposition testimony' falls outside of the doctrine's ambit." *Id*. (quoting *S.W.S. Erectors, Inc.*, 72 F.3d at 496). However, an explanation is required where the affidavit contradicts, rather than supplements, the deposition testimony. *Id*. (citing *S.W.S. Erectors, Inc.*, 72 F.3d at 495).

Attached to FEUER's Motion for Summary Judgment [49] is Bell's deposition transcript. Attached to Bell's Response to the Motion for Summary Judgment [56] is an Affidavit from Bell. Relying on the sham-affidavit doctrine, FEUER asserts that "[b]ecause Bell's self-serving affidavit contradicts his prior deposition testimony in material ways, without sufficient explanation, it should be disregarded." [59] at p. 1.

Turning to the alleged discrepancies between Bell's deposition testimony and sworn affidavit, the Court first examines Bell's account of when Hittlet's behavior towards him began to change. At his deposition, Bell recalled the timing of his complaint and surrounding events as follows:

> Q.    So now I'm going to – let's see. When did you complain about [Hittlet's sexual comment]?
>
> A.    That was September 2019 as well.
>
> Q.    Do you remember – did you complain the same day?
>
> A.    No ma'am. I pondered on it for a while and I noticed his behavior changing towards giving me more and more work every day and whatnot. Just a complete different guy from

> when I first started, and I talked to my dad about it. And I was like – he was like – I asked him what I should do. And he said if I were you, I would report it, and that's what I did.
>
> Q.    So let's unpack that a little bit. So you said Ken's behavior started changing?
>
> A.    Yes, ma'am.
>
> Q.    I want to make sure I got this right. By he was giving you more work to do?
>
> A.    More work, more so talk – talking to the other guys, kind of leaving me out of projects and stuff, kind of, you know, sticking me off to the back.
>
> Q.    And this is all before you made the report, correct?
>
> A.    Yes, ma'am.

[49], Ex. 1 at p. 10-11.

Bell's affidavit provides the following statements regarding these events:

> 5. While I was making my complaint *on the same day*, Human Resources Manager Claire Kammerer made an off-hand comment about it having been awhile since she gave employees "anti-harassment training," but this comment was not given as an outcome or result of any alleged investigation.
>
> . . .
>
> 8. Prior to [mid-December 2019] I began looking for a new job because I did not believe the Defendant was taking the complaint seriously, and Mr. Hittlet began making my work more difficult by assigning task where I had no one to help him. [sic] In the past, the tasks that were assigned to me I had someone to help me perform them.
>
> . . .
>
> 23. Ms. Kammerer then asked me why I was wanting to leave. I responded that my work environment changed after my complaint of sexual harassment.

24. Ms. Kammerer asked what had changed. I then explained how Mr. Hitlett [sic] began assigning me more difficult task [sic] with no assistance. At this point Mr. Illig ended the meeting by saying "We think you should just leave because we don't think you will be happy if you continue employment." So, I was terminated on December 19, 2019.

[56], Ex. 1 at p. 1, 2, 4 (emphasis added).

So, at his deposition, Bell testified that he did not file his complaint on the day that Hittlet made the sexual comment. Rather, Hittlet began treating him differently and Bell then reported the comment later in September 2019. On the other hand, Bell's affidavit asserts that he complained of the sexual comment on the day it was made and Hittlet's behavior towards him changed *subsequent to* the complaint. Because the affidavit provides an account that is inherently inconsistent with the account provided at the deposition (regarding whether Hittlet's behavior changed before or after the complaint) with no explanation for the inconsistency, the Court must disregard the contradictory facts in Bell's affidavit. *See, e.g.*, *Seigler,* 30 F.4th at 477 (citing *S.W.S. Erectors, Inc.*, 72 F.3d at 495).

Turning to the next alleged discrepancies, Bell's affidavit provides information on two events that he *did not discuss in his deposition*. First, Bell describes the following interaction between Kammerer and Hittlet:

17. Later that same day [that Kammerer shredded his resignation letter], Mr. Hittlet and Ms. Kammerer had a heated argument in the HR office. I could not hear what was said during the argument as I was not in the room, but there was a glass window where I could see the two making gestures with their hands towards each other where it was clear they were in a heated argument.

18. Then a few minutes later Ms. Kammerer told me that a member of the management team didn't think she should let me rescind my two-week notice.

19. I acknowledged this statement, correctly assuming it was Mr. Hittlet that Ms. Kammerer was speaking about, yet I considered the

> matter closed since I had already rescinded my resignation and my
> resignation documents had been shredded by Ms. Kammerer.

[56], Ex. 1 at p. 3.

Because Bell did not describe this interaction in his deposition, the description of the event

provided in his affidavit serves to *supplement* his deposition, not *contradict* it. Therefore, the Court

will consider those additional facts in deciding the present Motion [49].

The next event described in Bell's affidavit but not in his deposition is more difficult to

evaluate. In Bell's deposition, he provided the following testimony regarding a meeting held

between Kammerer, Hittlet, and Illig (prior to Bell meeting with Illig to discuss remaining at

FEUER):

> Q.     Now in your complaint you say that Mr. Hittlet talked Marco
>        [Illig] out of allowing you to stay. Is that correct?
>
> A.     Yes, ma'am.
>
> Q.     What personal knowledge do you have of that?
>
> A.     They – Marco [Illig], Claire [Kammerer], and Ken [Hittlet],
>        they had a meeting that Monday before – before I arrived –
>        before he told me to come in – in the office.
>
> Q.     And do you have any personal knowledge of what was said
>        in that meeting?
>
> A.     I do not.
>
> . . .
>
> Q.     Do you know if Marco [Illig] even knew about the
>        September complaint against Ken [Hittlet]?
>
> A.     I'm not sure.

[49], Ex. 1 at p. 22-23.

Bell's affidavit gives the following information about the meeting between his superiors:

21. However, before the meeting on December 16, 2019 [Bell's final meeting with Illig] could take place, Mr. Hittlet and Ms. Kammerer had a meeting with Mr. Illig. When I arrived for the meeting, Mr. Hittlet and Ms [sic] Kemmerer [sic] were also present with Mr. Illig.

22. When the meeting began Mr. Illig started by saying "Let's just get to the point."

23. Ms. Kammerer then asked me why I was wanting to leave. I responded that my work environment changed after my complaint of sexual harassment.

24. Ms. Kammerer asked what had changed. I then explained how Mr. Hittlet began assigning more difficult task [sic] with no assistance. At this point Mr. Illig ended the meeting by saying "We think you should just leave because we don't think you will be happy if you continue employment." So, I was terminated on December 19, 2019.

[56], Ex. 1 at p. 3-4.

Bell's deposition testimony was that Kammerer and Hittlet met with Illig before Bell arrived to speak with Illig regarding staying at FEUER. His affidavit provides the same fact. While Bell, in his deposition, provided no information on who was present or what was discussed at his final meeting with Illig, his affidavit provides that Kammerer and Hittlet were in fact present at the meeting. The facts provided up until this point do not clearly conflict with each other, so the Court will consider them. The facts begin to diverge when Bell recalls what he said at his final meeting with Illig. Bell initially testified that he was unsure whether Illig knew of his complaint regarding Hittlet. Conversely, Bell's affidavit states that he in fact told Illig of the complaint at their final meeting. This creates two facts that are inherently inconsistent, and the Court will therefore disregard the affidavit's content regarding Bell's statement at the final meeting.

Having clarified the facts which it will consider, the Court will turn to the merits.

II.     *Retaliation Claim*

"Retaliation claims under Title VII are governed by the familiar three-step *McDonnell Douglas* test." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007) (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Under that test, an employee "must first produce evidence of a prima facie case of retaliation." *Id*. at 387. To establish a prima facie case of retaliation under Title VII, "a plaintiff must show that (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse action." *Bedford v. Tex. Dept. of Trans.*, 810 F. App'x 264, 267 (5th Cir. 2020) (citing *Septimus*, 399 F.3d at 610). "If the employee establishes a prima facie case, the burden shifts back to the employer to state a legitimate, non-retaliatory reason for its decision." *LeMaire*, 480 F.3d at 388-89 (citing *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754-55 (5th Cir. 2005)). "If the employer meets this burden, the presumption of discrimination disappears and the burden shifts back to the plaintiff to establish that the employer's proffered reason is pretextual." *Hernandez v. Metro. Transit Auth. of Harris Cty.*, 673 F. App'x 414, 417 (5th Cir. 2016) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

A.     *Prima Facie Case*

The Court will first address whether Bell has established a prima facie case of retaliation. As to the first element, there is no dispute that Bell's complaint regarding Hittlet's comment was a protected activity. *See*, *e.g.*, *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427-28 (5th Cir. 2000)) ("For the first element, an employee has engaged in protected activity if he has (1) opposed any practice made an unlawful employment practice by this subchapter, or (2) made a charge,

10

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.").

Next, the Court considers whether FEUER's refusal to accept Bell's recission of resignation constitutes an adverse employment action. This is not a straightforward question in light of the particular facts of this case.

In a relatively recent case, the Fifth Circuit announced that an employer's refusal to accept a rescission can be an adverse employment action, but it depends on the specific facts of the case. *Porter v. Houma Terrebonne Hous. Auth. Bd. of Com'rs*, 810 F.3d 940, 946 (5th Cir. 2015). In *Porter*, the plaintiff (Porter), who worked for the Houma Terrebonne Housing Authority Board of Commissioners, had been sexually harassed by her supervisor, Wayne Thibodeaux, for some time. *Id*. at 943. Porter tendered her resignation on June 6, 2012, to take effect August 1, 2012. *Id*. She then requested the effective date of her resignation be put off until September 1, 2012, so that she could complete projects and train new staff. *Id*. Thibodeaux approved the extension the same day. *Id*.

When Porter resigned, she did intend to leave, and she had not filed any formal grievance regarding Thibodeaux's inappropriate behavior. *Id*. However, on July 12, 2012, when Porter's fiancé and fellow employee, Troy Johnson, initiated an unrelated grievance hearing, Porter decided to testify about Thibodeaux's behavior. *Id*. She subsequently testified on or about July 25, 2012. *Id*. at 944. As a result of the hearing, Thibodeaux was told to behave more appropriately and the office was directed to undergo sexual harassment training. *Id*. at 944.

Prior to Porter testifying at the hearing, the Chairman of the Board called Porter and asked her if she would consider rescinding her resignation. *Id*. at 943-44. In late August 2012, after Porter testified at the hearing, her direct supervisor, Jan Yakupzack, also asked her to consider remaining

11

at the organization. Yakupzack additionally reached out to Porter's mother and pastor to encourage Porter to stay on. *Id*. at 944.

The effective date of Porter's resignation (September 1, 2012) fell on the Saturday of Labor Day weekend. On the Tuesday after Labor Day, Porter wrote a letter rescinding her resignation and requesting leave until September 11, 2012. *Id*. Yakupzack approved the leave request and forwarded the letter to Thibodeaux with a statement that she supported Porter's recission. *Id*. "Acting in his sole discretion," Thibodeaux rejected Porter's attempted recission, stating that he had "determined that [Porter] was not satisfied or happy being an employee of . . . the Housing Authority." *Id*. This was the only separation decision Thibodeaux had ever made against Yakupzack's advice. *Id*. at 947.

In determining whether the rejection of Porter's recission was an adverse employment action, the Fifth Circuit held that "[t]he key question is whether the challenged action is 'materially adverse' in that it is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.' The standard is objective, but 'the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.'" *Id*. at 945 (quoting *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 68-69, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).

Applying this rule, the Fifth Circuit found that the rejection of Porter's recission was an adverse employment action. *Id*. at 948. In so holding, the *Porter* court explained that employees do not generally tender a resignation while depending on an employer to later accept a recission, but the adverse employment action inquiry requires exploration of the context. *Id*. at 947. Thus, the *Porter* court focused on whether "a reasonable employee in Porter's shoes might have legitimately expected that her recission of resignation would be accepted." *Id*. The court ultimately

12

concluded: "while a reasonable employee might not normally expect that she was entitled to rescind her resignation, in this particular context, a reasonable employee in Porter's shoes might have expected it. In light of the expectation, a fact-finder could determine that Porter would have been "well dissuad[ed] from making ... a charge of' sexual harassment if she knew it would destroy the chance that her rescission would be accepted." *Id.* at 948.

The court pointed to several particular circumstances that contributed to Porter's expectation that she could rescind her resignation. First, Porter was asked to consider rescinding her resignation both before and after she engaged in the protected activity of testifying against Thibodeaux. *Id.* While neither of the superiors that asked her to consider remaining in her position had the authority to accept her rescission, "their requests may have contributed to a reasonable belief that [she] was at liberty to rescind, especially considered in the light most favorable to Porter." *Id.* Second, Porter was allowed to stay on a month longer than her initial effective resignation date, "plausibly creating an expectation that her resignation was still negotiable and not finalized." *Id.* Finally, Porter was aware of four other employees who had been allowed to rescind their resignations, and Thibodeaux had never made a separation decision against Yakupzack's advice. *Id.* at 947-48.

The Court finds the factual similarities in *Porter* and the case at hand indicate a reasonable employee in Bell's shoes may have reasonably expected his rescission would be accepted. Kammerer called Bell on his day off and asked him if he was really leaving. When Bell reported to work again, he met with Kammerer, who admits that she "asked Bell to reconsider his resignation." [49], Ex. 2 at p. 1. Bells recalls that when he met with Kammerer, they discussed his pay and that performance reviews would be held in April 2020—a date well beyond the effective date of his resignation. The following morning Bell informed Kammerer that he wished to rescind

13

his resignation, and Kammerer was "happy" with the decision and tore up his resignation letter. [49], Ex. 1 at p. 19. Later at the Christmas party, CEO Mark Illig told Bell "I hate to see you go. I want you to be happy[,]" inviting Bell to discuss remaining employed at FEUER. *Id*. at p. 21-22.

Thus, as in *Porter*, two of Bell's superiors (one of whom was the CEO of the company) invited Bell to discuss remaining at FEUER, giving him the impression that he was at liberty to rescind his resignation. Though the invitations to discuss staying did not guarantee Bell's recission would be accepted, Kammerer's immediate destruction of the resignation letter suggested that Bell was not only at liberty to rescind his resignation but also that the company intended to accept the recission. Moreover, Illig's statements to Bell at the Christmas party were relatively complimentary statements that suggested Illig would accept Bell's recission, which he ultimately had the power to do. Additionally, as in *Porter*, when Bell submitted his resignation in December 2019, he was aware that an employee had been allowed to rescind her resignation in October 2019. [49], Ex. 1 at p. 25. The circumstances Bell faced were very similar to those in *Porter*. Taking all of these factors into account, the Court finds that a reasonable employee in his position may have reasonably expected that his recission would be accepted. In other words, "a fact-finder could determine that [he] would have been 'well dissuaded from making a charge of' sexual harassment if [he] knew it would destroy the chance that [his] recission would be accepted." *Porter*, 810 F. 3d at 948.

Urging that FEUER's rejection of Bell's recission was not an adverse employment action, FEUER emphasizes that:

> Although Kammerer and Illig did talk to Bell about staying at FEUER and Kammerer ripped up his resignation notice, he was never given any other indication that his recission was finalized. In fact, it was after Bell believed he had already effectively rescinded his resignation that Illig spoke to him about wanting him to stay on.

[50] at p. 11.

Taking this position, FEUER essentially argues that Bell (subjectively) did not reasonably believe his recission was finalized. To this, the Court emphasizes that the question in *Porter* was whether "a reasonable employee in Porter's shoes might have legitimately expected that her recission of resignation would be accepted," not whether the employee subjectively believed her recission was final. *Porter*, 810 F. 3d at 947.

FEUER further argues that the rejection of Bell's rescission was not an adverse employment action because Bell made his complaint two and a half months prior to tendering his resignation. FEUER specifically argues as follows:

> Only if a reasonable employee "would have been well dissuaded from making a charge" because he knew that complaining would destroy his chance of rescinding his resignation, could it possibly be an adverse employment action. *Porter v. Terrebonne Housing Auth. Bd. of Com'rs*, 810 F. 3d 940, 947-48 (5th Cir. 2015) (cleaned up). Bell has provided no evidence that he would have not complained in September if he knew that he could not resign and then rescind that resignation in December.

[59] at p. 4.

FEUER's contention is an incomplete look at *Porter*. FEUER is correct that, unlike Porter, at the time of Bell's complaint, he had not resigned so he would not yet have had the reasonable expectation that he could rescind his resignation. So, FEUER concludes, Bell could not have been dissuaded from bringing a charge that would destroy his chance of recission. The Court acknowledges the minor difference in the timeline of the protected activity and adverse action here and in *Porter*. However, looking at the spirit of *Porter* as a whole, there is a genuine question as to whether FEUER's rejection was an adverse employment action. The *Porter* court emphasized that "the significance of any given act of retaliation depends on the particular circumstances." *Porter*, 810 F.3d at 946, (quoting *Burlington Northern*, 548 U.S. at 57, 69, 126 S. Ct. 2405)). Thus,

15

the Court considers these events in context and declines to wholly preclude Bell from proceeding in this case simply because the events in this case do not perfectly match *Porter*'s timeline. As the Fifth Circuit held, "context matters." *Id*. Considering the context, a reasonable juror could find that a reasonable employee in Bell's position might be well dissuaded from engaging in a protected activity if the consequence of doing so would ultimately preclude him from rescinding a resignation of this nature. The second element is satisfied for summary judgment purposes.

As to the third prima facie element, a plaintiff must show "a causal link exists between the protected activity and the adverse action." *Bedford*, 810 F. App'x at 267. "[T]emporal proximity between the protected activity and alleged retaliation is sometimes enough to establish causation at the prima facie stage," but the temporal proximity must be "very close." *Porter*, 810 F.3d at 948. "[The Fifth Circuit] has accepted a two-and-a-half month gap as sufficiently close in one case, and rejected nearly the same timeframe in another." *Id*. at 948-49 (citing *Richard v. Cingular Wireless, LLC*, 233 F. App'x 334, 338 (5th Cir. 2007) (unpublished); *Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 401-02 (5th Cir. 2012) (additional citations omitted)). "Even absent temporal proximity, a plaintiff may still show a causal connection if there is 'other evidence of retaliation,'" such as "an employment record that does not support [the employer's action], or an employer's departure from typical policies and procedures." *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 348 (5th Cir. 2016) (quoting *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013)).

Here, Bell reported Hittlet's sexual comment in September 2019. Illig rejected the recission of his resignation on or about December 16, 2019. In between these events, Kammerer conducted an investigation, and the anti-harassment training that followed her investigation was held in December, around the time that Bell attempted to rescind his resignation. This two-and-a-half-

month gap is likely small enough to establish causation based on temporal proximity alone. However, the Court recognizes that the timeline of this case (as noted above) is somewhat atypical. Therefore, out of an abundance of caution, the Court notes that there is other evidence that supports a causal connection between the complaint and adverse action. Kammerer suggested that Bell was at liberty to rescind his resignation, and Illig invited Bell to discuss rescinding his resignation. After Hittlet apparently fought with Kammerer in the HR office and opposed Bell's recission, and after Hittlet met with Illig and Kammerer, Bell was not allowed to rescind his resignation. A reasonable fact-finder could infer a causal link between Bell's complaint and the rejection of his recission. The Court finds this to be sufficient for purposes of this stage of the analysis, particularly considering that the burden of proof as to causation is less stringent at the prima facie stage. *See, e.g., Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1001 (5th Cir. 2022) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). Therefore, the Court finds Bell has established a prima facie case of retaliation.

### B.  Legitimate, Non-retaliatory Reason

The burden now shifts to FEUER to provide a legitimate, non-retaliatory reason for rejecting Bell's recission. "'This burden is one of production, not persuasion,' and it involves no credibility assessment." *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir 2019) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). FEUER claims it rejected Bell's recission because efforts, including scheduled interviews, had already been made to replace him. FEUER also believed "Bell would attempt to leave again at the first opportunity." [49], Ex. 2 at p. 2. The Court finds this reason sufficient for purposes of this stage of the proceedings.

17

C. *Pretext*

If the defendant carries the burden of producing a legitimate, non-retaliatory reason for the adverse action, "the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Feist*, 730 F.3d at 454 (quoting *LaMaire*, 480 F.3d at 388-89). The employee accomplishes this by showing that the adverse action would not have occurred "but for" the employer's retaliatory motive. *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)) (additional citation omitted). "[T]o avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Id.* (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

FEUER argues that Bell cannot establish but-for causation because he has no evidence (1) that Hittlet talked Illig out of allowing him to stay, (2) that Illig knew of Bell's complaint against Hittlet, or (3) that Illig had any animus towards Bell. FEUER asserts that Bell simply believed that Hittlet convinced Illig to reject his recission because Hittlet did not display Bell's preferred level of enthusiasm when he announced he was staying, and a plaintiff's subjective belief that discrimination occurred is not enough to establish pretext.

To this, Bell responds that FEUER is liable under the cat's paw theory of liability, where "a plaintiff can establish but-for causation even if the decisionmaker directly responsible for the adverse employment action did not act of retaliatory animus." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (citing *Zamora v. City of Houston*, 798 F.3d 326, 335 (5th Cir. 2015)). "A plaintiff proceeding under this theory must prove that (1) [his] supervisor, motivated by retaliatory animus, took action intended to cause an adverse employment action; and

18

(2) that action was the but-for cause of [his] adverse employment action." *Id.* (citing *Zamora*, 798 F.3d at 333). The cat's paw theory appears to be applicable here because Bell admits that Illig, the decisionmaker, had no "ill feelings" against him. [49], Ex. 1 at p. 23.

As to the first prong required to succeed on a cat's paw theory, the record shows Hittlet was aware of Bell's complaint. Kammerer questioned him and reprimanded him as part of her investigation. Notably, where Kammerer's affidavit states that Hittlet admitted to making the comment, the next sentence in the same paragraph states "I was told by Hittlet and other witnesses that Bell also made inappropriate comments." [49], Ex. 2 at p. 1. Viewed in the light most favorable to Bell, a reasonable juror could find that Bell's complaint was particularly likely to cause retaliatory animus in Hittlet because he was reprimanded for behavior in which Bell also engaged. A reasonable fact-finder could conclude that Hittlet was motivated by retaliatory animus.

The record also establishes that Hittlet may have taken action to cause an adverse employment action—specifically, persuading Illig not to accept Bell's rescission. Bell witnessed Hittlet and Kammerer engage in a heated argument moments before Kammerer informed him that a member of management opposed his rescission of resignation. Bell also asserts that Hittlet and Kammerer met with Illig directly before Bell was to speak with Illig about staying at FEUER. Prior to meeting with Hittlet, both Illig and Kammerer apparently wanted Bell to remain at the company. Their attitude changed after speaking with Hittlet. A reasonable fact-finder could infer that Hittlet, at these meetings, took action to prevent Bell's rescission from being accepted.

Finally, a reasonable juror could find that Illig would not have rejected Bell's rescission but for Hittlet's influence. Illig was complimentary toward Bell and invited Bell to discuss staying on at FEUER, even though it seems the company had already begun a search for Bell's replacement. After meeting with Hittlet and Kammerer, Illig decided not to accept Bell's rescission. Therefore,

19

the Court finds Bell has shown a conflict in substantial evidence on whether FEUER would have rejected his recission but for his complaint.

As noted above, the Court's role at this stage of the proceedings is not to resolve factual disputes but, rather, simply determine if any such disputes exist. *See, e.g., Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). The Court finds that genuine issues of material fact remain in dispute. Summary judgment is not appropriate.

*Conclusion*

For the reasons set forth above, FEUER's Motion for Summary [49] is DENIED. Bell shall be permitted to proceed to trial on his retaliation claim.

SO ORDERED, this the 25th day of October, 2022.


/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE